UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 11-50031 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| LEONARD CHASE ALONE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

Defendant Leonard Chase Alone, Jr. is before the court pursuant to an indictment charging him with abusive sexual contact, in violation of 18 U.S.C. §§ 2244(a)(5), 2246(3) and 1153.  Mr. Chase Alone filed a motion to suppress, seeking to exclude from evidence at trial the statement he gave to law enforcement agents on March 2, 2011.  See Docket No. 17.  The government resists this motion.  See Docket No. 19.  The district court, the Honorable Jeffrey L. Viken, referred the motion to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  See Docket No. 14.  The following are this court's findings and conclusions.

**FACTS**

An evidentiary hearing was held on Mr. Chase Alone's motion on Friday, April 22, 2011.  Present at the hearing were Mr. Chase Alone, his counsel,

Assistant Federal Public Defender Gary Colbath, and Assistant United States Attorney Sarah Boensch Collins.   The government presented the testimony of two witnesses, Special Agent Sherry Rice and Special Agent Charles Blackburn, both of the Federal Bureau of Investigation.  The government also introduced three exhibits at the hearing: first, a copy of the advisement of rights form which Agent Rice read to Mr. Chase Alone and which Mr. Chase Alone signed, see Exhibit 1, and two handwritten statements drafted by Mr. Chase Alone. See Exhibits 2 and 3.  In addition, Mr. Chase Alone testified at the hearing. From this evidence, the court makes the following findings of fact.

On February 20, 2011, Agent Rice was advised of a report that Mr. Chase Alone had allegedly engaged in sexual abuse with a minor victim.  See Suppression Hearing Transcript, Docket No. 27 (hereinafter "SH") at 9, lines 22-25; 10, at lines 1-3.  Between February 20 and March 2, 2011, Agent Rice interviewed the alleged victim and some witnesses.  Id. at 10, lines 4-7.

Tribal authorities had arrested Mr. Chase Alone on February 20, 2011, on tribal charges of liquor violation, possession of a controlled substance, and sexual abuse based on the same allegation being investigated by Agent Rice. Id. at 82, lines 20-25; and 83, lines 1-3.  Between February 20 and March 2, Mr. Chase Alone made a court appearance of an unspecified nature in tribal court.  Id. at 57, lines 24-25; and 58, line 1.  He was being represented by

Mr. Ken Bordeaux on his tribal charges.  Id. at 57, lines 19-23.   No evidence was introduced at the hearing regarding whether Mr. Bordeaux is a licensed attorney, law-trained, or a lay person.  The court notes that he is not listed as an active member of the South Dakota State Bar Association.  Mr. Chase Alone was held in tribal custody at the Pine Ridge jail from the time of his arrest on February 20 until he was arrested on the indictment in this case on March 21, 2011.  Id. at 56, lines 12-14; and 80, lines 17-25; and 81, lines 1-15.

On March 2, 2011, Agents Rice and Blackburn traveled to the Pine Ridge jail to interview Mr. Chase Alone.  Id. at 10, lines 7-15; page 11, lines 9-14. They arrived at approximately 11:00 a.m.  Id. at 11, lines 4-5.  Jail staff placed Agents Rice and Blackburn in the contact visitation room at the jail.  Id. at 11, lines 15-17.  The room is approximately 30 feet by 15 feet in size, and contains three small square tables, each with a checkerboard built into the top surface. Id. at lines 17-25.  There is a window looking into another interior room for noncontact visits.  Id. at 24-25.  There are two doors in the north side of the room.  Id. at 22-24.  The doors are locked and may be unlocked by activating a push-button intercom system.  Id. at page 12, lines 6-18.  The doors are monitored by jail staff via a closed-circuit video system.  Id.

Agents Rice and Blackburn were not armed.  Id. at 13, lines 12-19. Mr. Chase Alone had never met Rice or Blackburn before, nor had he ever been interviewed by any FBI agent before.  Id. at 56, lines 4-11.

3

Upon arriving in the room, the FBI agents pulled up three chairs to the center table.  Id. at 21-25.  Mr. Chase Alone entered the room at 11:03 a.m.  Id. at 13, lines 10-11.  The two agents stood up, introduced themselves to Mr. Chase Alone, showing him their FBI credentials, and shook his hand.  Id. at 20-25; 14, at line 1.

Mr. Chase Alone volunteered that he knew that the agents were there to investigate an allegation that he had molested a child, whom the court refers to as "E."  Id. at 18, lines 10-18.  He testified at the hearing that, at the time he was arrested by tribal officials, the tribal law enforcement officer who arrested Mr. Chase Alone told him that the FBI might be in contact with him at some point.  Id. at 57, lines 4-18.  Agent Rice confirmed that she and Agent Blackburn were there to investigate "everything that happened on February 20."  Id. at 18, lines 22-23.  Agent Rice testified that she did not at this point make any reference that would have led Mr. Chase Alone to suspect that any allegations of a sexual nature had been made against him.  Id. at 19, lines 1-10.

The three sat down at the middle table.  Mr. Chase Alone was not restrained in any way and was free to move about the room.  Id. at 21, lines 1-2.

Agent Rice first asked Mr. Chase Alone some background questions to ensure it was appropriate to interview him.  Id. at 16, lines 10-22.  She asked

him whether he could read and write English, to which Mr. Chase Alone said "yes." Id. at 15, lines 19-24; 16, lines 10-13.  She asked him about his education and Mr. Chase Alone indicated he had gone through school up to the ninth grade.  Id. at 31, lines 5-11.  At the suppression hearing, Mr. Chase Alone also added that he had always been enrolled in special education classes and had dropped out in the ninth grade because he was two years behind his peers at that point, in fact operating at a seventh grade level.  However, he agreed that he never gave this information to Agent Rice on the day of the interview.  Id. at 71, lines 19-25.  Agent Rice asked Mr. Chase Alone whether he was taking any prescription drugs and Mr. Chase Alone indicated he was not.  Id. at 16, lines 2-3.  She also asked him when the last time he drank alcohol or took any drugs was.  Id. at 16, lines 3-7.  Mr. Chase Alone indicated that he had last drunk alcohol on February 19, 2011, and last smoked marijuana on February 20, but that he had not had any intoxicating substances since February 20.  Id.  Agent Rice made note of all these things on the upper left-hand corner of Exhibit 1, except that she neglected to note what Mr. Chase Alone told her about his education.  Compare Exhibit 1, with SH at 15, lines 19-24; and 16, at lines 2-7.

Agent Rice also asked Mr. Chase Alone specifics about his identity, birth date, social security number, address, and other similar questions.  See SH at 48, lines 23-25; and 49, lines 1-8.  Agent Rice testified that he answered all

5

these questions appropriately and seemed to understand everything that Agent Rice said and asked.  Id. at 49, lines 1-8.

Agent Rice handed Mr. Chase Alone the official FBI advice of rights form, Exhibit 1, which had her aforementioned notations written on the top left corner.  Id. at 14, lines 2-17.  Agent Rice handed Mr. Chase Alone a pen.  Id. at 15, lines 19-24.  The following is a verbatim recitation of the rights set forth under the heading in bold capital letters, "**YOUR RIGHTS**," on Exhibit 1:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

See Exhibit 1.  Next to each of the above statements on Exhibit 1 appears the defendant's initials:  "LCA."  Id.

Agent Rice testified that, with Exhibit 1 in front of him and a pen in his hand, she read each of the rights on Exhibit 1 to Mr. Chase Alone, pausing after the reading of each right to ask him whether he understood the right.  Id.

at 17, lines 2-8.  After Agent Rice read each right, Mr. Chase Alone indicated to Agent Rice that he did understand what she had read to him, and he placed his initials following the right to indicate his comprehension.  Id.

Following the reading and initialing of the above rights, Agent Rice advised Mr. Chase Alone of his Griffin warnings.  Id. at 32, lines 19-25; and 33, lines 1-25.  See United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (evaluating whether a defendant is in custody, in part, by asking whether the police told the defendant that the interview was voluntary, that he was free to leave or to request the officers to leave, and that he was not under arrest). Agent Rice told Mr. Chase Alone that, although he was in tribal custody, he was not being arrested on federal charges at that time.  Id.  She also told him that he would not be arrested on federal charges that day.  Id.  Agent Rice indicated, however, that the tribal charges remained in effect and that she could not release him from jail on the tribal charges.  Id.  Agent Rice told Mr. Chase Alone that federal charges might be asserted against him at some point in the future.  Id. at 34, lines 1-6.  Agent Rice was adamant that she never indicated to Mr. Chase Alone that he might be released from tribal jail based on how the interview with her went.  Id. at 34, lines 14-18.  Agent Rice told Mr. Chase Alone that if he chose to speak to her, he could stop at any time.  Id. at 49, lines 15-22.  Mr. Chase Alone acknowledged that he understood these advisements.  Id. at 50, lines 7-13.

Mr. Chase Alone testified that Ken Bordeaux, his representative in tribal court, had told him that tribal authorities would release him if he gave an interview to federal authorities.  Id. at 58, lines 5-16.  Based on this, Mr. Chase Alone believed that if he talked to Agents Rice and Blackburn, he would get out of tribal jail.  Id. at 59, lines 1-10.

Following the above statements on Exhibit 1 is the heading in bold capital letters, "**WAIVER OF RIGHTS**."  Id.  Below that heading are two sentences:  "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Id.  Agent Rice testified that, as to the waiver, she asked Mr. Chase Alone to read the heading and the two sentences following the heading out loud to ensure that he really could read.  Id. at 17, lines 16-23.  Agent Rice testified, as did Mr. Chase Alone, that he was able to read the waiver without any difficulty.  Id. at 17, lines 16-23; and 73, lines 19-25; and 74, lines 1-7.  Mr. Chase Alone then indicated that he would agree to waive his rights and talk to Agents Rice and Blackburn without a lawyer present.  Id. at 17, lines 21-23.  Agent Rice asked Mr. Chase Alone to sign the waiver to indicate his assent to the interview.  Id.

Exhibit 1 is signed by Mr. Chase Alone, with Agents Blackburn and Rice signing as witnesses.  Id. at 17, lines 9-12, 16-25.  The time noted at the top of Exhibit 1 is 11:03 a.m., and the time noted at the bottom is 11:07 a.m.  See

Exhibit 1.  Agent Rice testified that this is the elapsed time it took for her to go over Exhibit 1 with Mr. Chase Alone.  See SH at 34, lines 20-25; and 35, lines 1-2.

Agent Rice testified that Mr. Chase Alone did not show any indication that he was having difficulty comprehending or that he had any questions while she reviewed Exhibit 1 with him.  Id. at 18, lines 1-9.

After receiving Mr. Chase Alone's written and oral indications that he wished to talk to the agents, the interview proceeded to the substance of the events of February 20.  Agent Rice took the lead in questioning, but Agent Blackburn asked some questions too.  Id. at 20, lines 7-12.  Never at any point in the interview did Agent Rice observe any indication that Mr. Chase Alone was confused or that he was having trouble understanding the agents.  Id. at 20, lines 13-16.

Agent Rice and Agent Blackburn both testified that never at any point during the interview did Mr. Chase Alone express a desire to stop the interview, to leave the room, nor did he ever make any physical movements toward that end.  Id. at 20, lines 17-25; and 84, line 25; and 85, lines 1-9, 21-24.  Agent Rice testified that if Mr. Chase Alone had given any indication that he wanted to stop the interview or leave, she would have immediately terminated the interview.  Id. at 21, lines 3-13.

9

Mr. Chase Alone testified that he did decide to leave at one point during the middle of the interview.  Id. at 66, lines 4-8; and 79, lines 21-25; and 80, lines 1-15.  He testified that he approached the door leading back to the cell block, opened it slightly, then decided without any prompting from the agents, to resume the interview.  Id.  Upon questioning from the court, Mr. Chase Alone indicated that it was his own thought processes–not any intervention from the agents–that prompted him to resume his seat and continue with the interview.  Id.

During the interview, when Mr. Chase Alone made statements that were inconsistent with other statements he made to the agents, or that were contradicted by statements made by other persons, the agents would point out the inconsistency to him.  Id. at 21, 19-25; 22 at lines 1-7.  From the inception of the interview until approximately 12:15 p.m., Mr. Chase Alone denied any wrongdoing.  Id. at 36, lines 3-8.  Agent Rice asked Mr. Chase Alone why "E" would have said that he hurt her.  Id. at 36, lines 3-25; and 37, lines 1-17.  Mr. Chase Alone then began to add more details, including the fact that he placed "E" astride his legs at one point.  Id.

Although Agent Rice testified that she did not use sexual language in questioning Mr. Chase Alone about the events of February 20, Mr. Chase Alone testified that the agents asked him questions like, "Were you aroused whenever

she was against your leg?" or "Did you grab her in any way?"  Id. at 67, lines 15-25.

At 12:45 p.m. Mr. Chase Alone indicated that he would prefer to make a written statement instead of continuing to describe the events of February 20 orally to the agents.  Id. at 22, lines 16-22.  Agent Rice had a stenographer's pad with her and Mr. Chase Alone asked to be able to use her notebook and pen to write out a statement.  Id.  Agent Rice gave him her notebook and pen, and Mr. Chase Alone removed himself to another table and began to write.  Id. at 23, lines 1-25.  This hand-written statement was introduced at the hearing as Exhibit 2.  Agent Rice testified that it took Mr. Chase Alone approximately 15 minutes to write out Exhibit 2.  Id. at 23, lines 15-17.  While Mr. Chase Alone wrote Exhibit 2, the agents did not question or interrupt Mr. Chase Alone at all.  Id. at 39, lines 24-25; and 40, lines 1-12.  Mr. Chase Alone did ask the agents several times about the spelling of a word.  Id.  Exhibit 2 contains no admissions of criminal behavior.  See Exhibit 2.  There are several misspellings of ordinary words on Exhibit 2, such as "tabel" [table], "notheing" [nothing], "scard" [scared], and "tuk" [took].  Id.

When he finished writing Exhibit 2, Mr. Chase Alone came back to the middle table where the agents were and handed Agent Rice the document.  See SH at 23, line 25; 24, lines 1-2.  Agent Rice started to read the document aloud, but Mr. Chase Alone told her to crumple it up and that he would prefer

11

to just tell her orally what had happened.  Id. at 24, lines 3-6.  Agent Rice did not destroy the document, believing that it might have evidentiary value.  Id. at 24, lines 7-9.  Mr. Chase Alone testified that, after Agent Rice read Exhibit 2, she let out a sigh.  Id. at 63, lines 22-25; and 64, lines 1-14.

After Mr. Chase Alone created Exhibit 2, more interrogation ensued.  Id. at 24, lines 17-18.  The agents challenged Mr. Chase Alone's version of events as depicted on Exhibit 2, indicating that they thought he had left out details or was not being completely honest.  Id. at 42, lines 19-25; and 43, lines 1-6. After he was done verbally telling the agents what had happened on February 20, Agent Rice asked Mr. Chase Alone whether he wanted to make a recorded statement, either tape recorded or written.  Id. at 24, lines 18-20.  Mr. Chase Alone again indicated that he would make a handwritten statement.  Id. at 24, lines 19-20; 24-25; and 25, lines 1-4.

Exhibit 3 was Mr. Chase Alone's second handwritten statement, which was begun at 1:15 p.m. and finished at 1:22 p.m.  Id. at 25, lines 23-25; an 26, lines 1-12.  As before, Mr. Chase Alone removed himself to a separate table when he was writing Exhibit 3.  Id. at 26, lines 13-18.  As before, the agents did not interrupt or interrogate Mr. Chase Alone while he wrote, other than perhaps to answer additional questions he asked the agents about spelling.  Id. at 44, lines 11-16.  As with Exhibit 2, Exhibit 3 contains some misspellings (i.e. "whenet" for "went").

12

Agent Rice read Exhibit 3, which included a statement by Mr. Chase Alone that he had never removed "E's" pants.  Id. at 26, lines 20-25; and 45, lines 1-5.  Agent Rice then asked Mr. Chase Alone whether his hand or fingers ever went into "E's" pants, and he replied "no."  Id. at 45, lines 3-6.  Agent Rice asked Mr. Chase Alone whether he wanted to add another statement to that effect, which he did.  Id. at 26, lines 20-25; and 45, lines 3-9.  The interview finally concluded at 1:25 p.m.  Id. at 27, lines 1-3.  All three persons signed Exhibit 3.  Id. at 4-6.

The interrogation ended after Mr. Chase Alone wrote out his second handwritten statement to the agents at 1:25 p.m.  The agents remained for perhaps another 10 minutes, explaining to Mr. Chase Alone that they would write up a report of the investigation and give it to the United States Attorney's Office to review for determination of whether to prosecute.  Id. at 28, lines 1-3. The agents stood up, shook Mr. Chase Alone's hand, told him he could call the FBI if he had any concerns or questions, and left.  Id. at 28, lines 4-9. Mr. Chase Alone pushed the intercom button on the door leading back to the cell block, it was opened remotely by jail staff, and he left the room too.  Id. at 28, lines 8-13.

Throughout their contact with Mr. Chase Alone, Agent Rice testified that she and Agent Blackburn used a conversational tone of voice and displayed a "listening attitude" with a calm demeanor.  Id. at 19, lines 11-25; and 27, lines 15-20.  Agent Rice said she was trying throughout to be clear about what she

13

was saying and that she tried to be kind to Mr. Chase Alone in order to find out what he had to communicate.  Id.  Never at any time did Agent Rice or Agent Blackburn make any threats or any promises to Mr. Chase Alone.  Id. at 22, lines 8-15; and 27, lines 7-14.

When Mr. Chase Alone testified, he indicated that he had had trouble with all of his subjects in school, which is what led to his dropping out in ninth grade.  Id. at 53, lines 19-25; 54, lines 1-16.  He indicated that with regard to reading, he can often say the word, but he often does not know the meaning of the word.  Id. at 54, lines 17-22.  Most of the jobs Mr. Chase Alone has held have been physical labor types of jobs such as fencing, doing mechanical work, and working on a ranch.  Id. at 54, lines 23-25; and 55, lines 1-4.  Mr. Chase Alone acknowledged that Agent Rice had read Exhibit 1 to him.  Id. at 59, lines 11-25; and 60, lines 1-2.  He never testified that he did not understand those rights.  He affirmatively testified that he did not have any trouble understanding the waiver of rights.  Id. at 73, lines 19-25; and 74, lines 1-7.  He did say that he was anxious, as in "in a hurry," to talk to the agents so he could get out of tribal jail.  Id. at 60, lines 1-16.  He indicated that several inmates wanted to fight him because of the nature of the allegations being made against him.  Id.  However, he also admitted that he told Agent Rice that he wanted to stay in jail because it relieved him of his obligation to work and support his dependents.  Id. at 74, lines 8-12.  Neither Mr. Chase Alone nor

14

Agent Rice testified that Mr. Chase Alone ever expressed his desire to give his interview so he could get out of jail to avoid getting beaten up.

Mr. Chase Alone now moves to suppress his statement of March 2, 2011, given to Agents Rice and Blackburn.  He argues that his statement was not voluntary and that his waiver of <u>Miranda</u> rights was not voluntary, knowing, and intelligent.  Mr. Chase Alone also raises the issue in a post-hearing brief that the statement should be suppressed because his Sixth Amendment right to counsel was violated.  The government resists each of these grounds for suppression.

**DISCUSSION**

**A.     Whether Mr. Chase Alone's Statement Was Voluntary**

Mr. Chase Alone argues that his statement was involuntary because he was in custody, the custodial environment was coercive, he was forced to rely on his captors to "rescue" him from the interrogation room, he has limited education, he was under tribal arrest for the same acts that the FBI was interrogating him about, he did not understand the advisement of rights given to him by the FBI nor the consequences of waiving the rights of which he was advised, and finally, although he initially waived his rights, he later told the FBI agents that he wanted to terminate the interview and they would not honor his request to end the interview.  <u>See</u> Docket 18.  Mr. Chase Alone's arguments raise two issues: (1) whether his statement was voluntary and (2) whether his

15

waiver of his <u>Miranda</u> rights was voluntary, knowing and intelligent.  The court addresses the voluntariness of Mr. Chase Alone's statement first.

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." <u>Miller v. Fenton</u>, 474 U.S. 104, 109 (1985).  "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." <u>United States v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998).  The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." <u>Id.</u>  <u>See also</u> <u>Withrow v. Williams</u>, 507 U.S. 680, 688-89 (1993) (continuing to adhere to the totality of circumstances test).  The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence.  <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004).

The Supreme Court has made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."   <u>Colorado</u>

16

v. Connelly, 479 U.S. 157, 167 (1986).  That is because a *prima facie* showing of a due process violation must include a showing of some sort of *state action*. Id. at 165.  Therefore, a defendant's mental status alone can never result in a finding that his statement was involuntary without some form of police overreaching.  Id.

However, this does not mean that a defendant's mental status is irrelevant to the question of whether his statement was voluntary.  A defendant's mental status is still relevant under the totality of circumstances test to the extent the evidence shows that the police were aware of that mental status and acted in some way to exploit it.  See Townsend v. Sain, 372 U.S. 293, 298-99 (1963) (defendant's statement was involuntary when obtained following the police's administration of a truth serum to defendant); Blackburn v. Alabama, 361 U.S. 199, 207-08 (1960) (defendant's statement involuntary where police were aware of defendant's history of mental problems, knew that he was "probably insane," and proceeded with interrogation); United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995) (holding that totality of circumstances requires consideration of defendant's age, education, and experience insofar as police knew those facts).  Where a defendant suffered from some mental infirmity that caused him to want to confess and police were unaware of that infirmity, courts have found the necessary state action to be missing.  Connelly, 479 U.S. at 164-65; United States v. Rohrbach, 813 F.2d 142, 144-45 (8th Cir. 1987).

17

The existing precedent outlines the type of police conduct that courts have found to be coercive.  The conduct includes extreme duration and conditions of detention, the manifest attitude of police toward the defendant, pressures which sap or sustain a defendant's powers of resistance or self-control, and exploiting a defendant's mental and physical state.  See Spring, 479 U.S. at 574; Davis v. North Carolina, 384 U.S. 737, 739-53 (1966) (defendant held for 16 days of incommunicado interrogation in a closed cell without windows); Reck v. Pate, 367 U.S. 433, 436-44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); Culombe v. Connecticut, 367 U.S. 568, 569-70, 621-22 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); Payne v. Arkansas, 356 U.S. 560, 561-68 (1958) (defendant held incommunicado for three days with little food and threats that a lynch mob would be admitted into the jail); Ashcraft v. Tennessee, 322 U.S. 143, 153-55 (1944) (defendant questioned by relays of officers for 36 hours without sleep).  It is this body of law which the court applies to Mr. Chase Alone's assertion that his statement was involuntary.

Based on the legal analysis of Connelly and its progeny, the court considers all the facts and circumstances surrounding Mr. Chase Alone's statements in determining whether those statements were voluntary.  Withrow, 507 U.S. at 688-89; Fulminante, 499 U.S. 279; and Fenton, 474 U.S. at 109-10.  In this context, the court also considers Mr. Chase Alone' personal

18

characteristics to the extent they were known to the agents.  <u>Blackburn</u>, 361 U.S. at 207-08; <u>Makes Room For Them</u>, 49 F.3d at 415; <u>Jenner</u>, 982 F.2d at 333.

Based on <u>Connelly</u> and its progeny, the court concludes that Mr. Chase Alone's statement to Agents Rice and Blackburn was voluntary.  There was no evidence introduced of any kind at the hearing to suggest that either agent threatened, coerced, or attempted to subdue Mr. Chase Alone.  There was no physical coercion.

At one point during the interview, the agents confronted Mr. Chase Alone with facts from other witnesses or statements from the defendant himself that contradicted what Mr. Chase Alone was telling the agents.  This confrontation can be viewed as a form of psychological pressure, but it does not amount to coercion.  The agents did not become angry or raise their voices when they pointed out the fact that other witnesses had provided facts that were contrary to Mr. Chase Alone's story.  Nor did either agent use any cursing or expletives when confronting Mr. Chase Alone with the inconsistent facts.

Mr. Chase Alone asserts that he tried to stop the interview at some point.  This evidence was contradicted by both Agents Rice and Blackburn.  However, even crediting Mr. Chase Alone's testimony, he testified that it was his own thought processes that caused him to abandon his decision to leave, not any coercion from either of the agents.  Mr. Chase Alone thought he had something to gain by going forward with the interview and it was that desire to gain, not

anything the agents did or said, that caused Mr. Chase Alone to reconsider and turn around and sit back down to the interview.

Furthermore, there was no evidence introduced to suggest that Mr. Chase Alone suffered from any condition or infirmity that made him especially susceptible to pressure from law enforcement or that the agents were aware of any special weakness and acted to exploit that weakness. Mr. Chase Alone only told the agents that he had dropped out of school in the ninth grade. He never told them that he was in special education classes in school nor did he tell them that he could read, but not understand, some words. Outwardly, the agents did not observe anything that would lead them to doubt Mr. Chase Alone's level of understanding and comprehension.

Indeed, this court, even knowing the full context of Mr. Chase Alone's educational history, cannot conclude that Mr. Chase Alone was incapable of understanding the advisements given to him by the agents. Mr. Chase Alone is certainly uneducated, but to the court's observation, he is not unintelligent. At many times during the hearing he was articulate and well-spoken. He testified that Agent Blackburn did not participate actively in the interrogation, but "was mainly sitting there observing." See SH at 64, lines 17-19. He testified that he felt "aggravated" when the agents told him they wanted to hear his side of the story, but then rejected the initial versions of the events Mr. Chase Alone offered. Id. at 70, line 21. He concluded that the agents were not taking his story into "consideration." Id. at 70, line 18. He stated that he felt Agent Rice

had already "judged" him before she came to the interview. Id. at 70, lines 7-11. He testified that the agents "concluded" the interview and walked out the door at the end. Id. at 70, lines 2-3.

The law in this circuit is that as long as the suspect is of average intelligence, his statements will usually be held to be voluntary. United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004) (en banc) (citing United States v. Astello, 241 F.3d 965, 968 (8th Cir.), cert. denied, 533 U.S. 962 (2001) (holding that an eighteen-year-old with an eleventh-grade education understood what was being said during the interview); Simmons v. Bowersox, 235 F.3d 1124, 1134 (8th Cir.), cert. denied, 534 U.S. 924 (2001) (holding that confession was voluntary where suspect had an IQ of 88)). There was no evidence before Agents Rice and Blackburn, or indeed before this court at the evidentiary hearing, to suggest that Mr. Chase Alone did not possess at least that level of intelligence to understand the plain and simple statements of his rights given, the fact that he did not have to submit to the interview, the fact that he was not being placed under arrest, and the difference between tribal and federal charges.

Finally, the record is free of any evidence that either Agents Rice or Blackburn ever tried to suggest that Mr. Chase Alone would be released if he talked to them or if he made admissions to them. Mr. Chase Alone did form the idea that he would be released if he submitted to the interview, but this information appears to have been based on something his lay tribal advocate

21

said to him.  He readily agreed that neither FBI agent told him this.  This is
similar to the situation in Connelly where forces separate and apart from the
police coerced the defendant into confessing.  Connelly, 479 U.S. at 160-61 (the
"voice of God" told Connelly to either confess to a murder or commit suicide).
As in Connolley, the court concludes that unless the coercion came from the
police themselves, or unless the police were aware of the outside coercion and
acted to exploit it, there is no due process violation.  Id. at 165-67.

      The length of the interview in this case is unremarkable at approximately
two and a half hours.  The interview was certainly not of a marathon length
that, in itself, would break the will of an ordinary person.  See Davis, 384 U.S.
at 739-53; Reck, 367 U.S. at 436-44; Culombe, 367 U.S. at 569-70; Payne, 356
U.S. at 561-68; Ashcraft, 322 U.S. at 153-55 (all involving interrogations that
lasted several days and were combined with deprivation of sleep, food, or
water).

      There was no evidence that Mr. Chase Alone asked for food or water and
was denied such sustenance, or that he suffered from or complained of hunger,
dizziness, light-headedness, or thirst.  Mr. Chase Alone gave no indication of
being intoxicated or of suffering from any condition that affected his powers of
cognition.  Indeed, he had been in tribal custody since February 20, 2011,
making it unlikely that he had ingested any intoxicating substance.  He
affirmatively represented to Agent Rice that he had taken no prescription
medications or intoxicants.

22

Mr. Chase Alone relies on statements by the Eighth Circuit in United States v. LeBrun in support of his motion.  In the LeBrun case, Naval investigators reopened a thirty-year old investigation into the death of Ensign Andrew Muns, who had served aboard the same ship as Michael LeBrun in 1968, when Muns disappeared.  LeBrun, 363 F.3d at 717-19.  Investigators interrogated LeBrun three times in 1999, then did not contact him for 10 months.  Id. at 717-18.  On September 21, 2000, investigators arrived unannounced at LeBrun's place of employement and requested that LeBrun accompany them to the Missouri Highway Patrol office for an interview.  Id. at 718.  The officers did not tell LeBrun that the subject of the interview would be Muns' disappearance and LeBrun believed that the interview would be about certain criminal allegations concerning LeBrun's employer.  Id.  LeBrun accompanied the officers in the front seat of the patrol car, the door to which was unlocked.  Id.  LeBrun was not restrained in any way.  Id.

Prior to entering the highway patrol office, the officers told LeBrun that he was not under arrest, that he was free to leave at any time, and that he was subject to audio and visual recording within the building.  Id.  The officers then took LeBrun into the building where they entered a windowless interview room containing enlarged photographs of scenes from LeBrun's life.  Id.  No Miranda warnings were made.  Id.

The officers conceded that they used psychological ploys against LeBrun, such as telling him that he was the prime suspect in Muns' death and that

they had significant evidence tying him to the murder.  Id.  The officers painted a picture of LeBrun's future that included a lengthy trial that would break him financially and ruin his family's reputation.  Id.  However, the officers never raised their voices or physically threatened LeBrun.  Id.  After thirty-three minutes of questioning, LeBrun confessed to the murder of Muns.  Id. at 718-19.  LeBrun then removed a cell phone from his pocket and telephoned his wife.  Id. at 719.

Seven of the eleven judges of the Eighth Circuit joined in holding that LeBrun's statement was voluntary.  Id. at 724-27.  In so holding, the court relied on the fact that the interview was only 33 minutes long, neither officer was armed during the interview, the officers never shouted at LeBrun, and never physically threatened him.  Id. at 724.  Although the court recognized that psychological ploys had been used against LeBrun, it held that those ploys did not overbear LeBrun's free will.  Id. at 724-25.  The court examined in detail LeBrun's assertion that the officers promised him he would not be prosecuted if he confessed.  Id.  The court concluded that such a promise had not been given, but that even if it had been, that promise did not render the confession involuntary.  Id. at 725-25.

The court also noted that, even though LeBrun had not been advised of his Miranda rights, he testified that he had a subjective understanding of those rights at the time of the interview.  Id. at 726.  The court further relied on the fact that LeBrun was a sophisticated individual with military experience, a

24

college degree, one year of law school, and experience as a manager in a real estate office.  Id.  The court noted that as long as the suspect is of average intelligence, his statements will usually be held to be voluntary.  Id. (citing United States v. Astello, 241 F.3d 965, 968 (8th Cir.), cert. denied, 533 U.S. 962 (2001) (holding that an eighteen-year-old with an eleventh-grade education understood what was being said during the interview); Simmons v. Bowersox, 235 F.3d 1124, 1134 (8th Cir.), cert. denied, 534 U.S. 924 (2001) (holding that confession was voluntary where suspect had an IQ of 88)).  Finally, the court noted that LeBrun did not display to the officers so that they would be aware of it any "unique sensitivity" that would make him susceptible to having his will overborne.  Id.

The LeBrun case hurts, rather than helps, Mr. Chase Alone's argument. It is consistent with the law the court has already laid out:  a suspect's unique susceptibilities to having his will overborne are a legitimate part of the "totality of the circumstances" test *to the extent the police knew of, and acted to exploit, them*.  Here, there is no evidence in the record that Mr. Chase Alone actually had any such susceptibilities, but if he did, there is no evidence in the record that Agents Rice and Blackburn (1) were aware of them and (2) acted to exploit them.  Accordingly, the court concludes that Mr. Chase Alone's statement to Agents Rice and Blackburn on March 2, 2011, was voluntary and recommends denying Mr. Chase Alone's motion to suppress on this basis.

25

**B.    Whether Mr. Chase Alone's Waiver of His <u>Miranda</u> Rights Was Valid**

Mr. Chase Alone also argues that his waiver of his <u>Miranda</u> rights was not voluntary, knowing, or intelligent.  Whether Mr. Chase Alone' statements should be suppressed pursuant to the rule in <u>Miranda</u> depends on whether Mr. Chase Alone effectuated a valid waiver of his <u>Miranda</u> rights prior to giving his statement to Agents Rice and Blackburn.

The holding of the <u>Miranda</u> case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).  <u>Miranda</u> warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may choose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time." <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987).  A <u>Miranda</u> warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  <u>United States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146 (8th Cir. 2007); <u>Griffin</u>, 922 F.2d at 1347; <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989).  The <u>Miranda</u> Court required that, prior to custodial interrogation, a suspect must be advised "that he has a right to remain silent, that any statement he does make may be

26

used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." <u>Miranda</u>, 384 U.S. at 445.

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect. <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980); ; <u>see also</u> <u>United States v. Head</u>, 407 F.3d 925, 925 (8th Cir. 2005) ("Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect."). The "words or actions" of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant. <u>United States v. Wipf</u>, 397 F.3d 677, 685 (8th Cir. 2005) (citing <u>Innis</u>, 446 U.S. at 301).

Here, neither party disputes that Mr. Chase Alone was in custody on March 2, 2011, nor that he was being interrogated. Neither party disputes that Agent Rice gave Mr. Chase Alone an advisement of rights before interviewing him. Neither party disputes that Mr. Chase Alone waived his <u>Miranda</u> rights and agreed to talk to the agents. What is at issue is whether that waiver was valid.

It is the government's burden to prove that a defendant's waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent. <u>United States v. Caldwell</u>, 954 F.2d 496, 508 (8th Cir. 1992). "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden

rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475.  However, the government "need prove waiver only by a preponderance of the evidence." Connelly, 479 U.S. at 168.

A waiver of one's Miranda rights may be either express or implied. Berghuis v. Thompkins, ___ U.S. ___, 130 S. Ct. 2250, 2261-62 (2010) (citing North Carolina v. Butler, 441 U.S. 369, 372-76 (1979)).  An implied waiver occurs when the suspect embarks on a course of conduct indicating, given the totality of circumstances, waiver.  Id.  The government must show that the suspect was advised of his Miranda rights, understood those rights, and then chose to make an uncoerced statement.  Id.  Simply proving that a Miranda advisement was given and that a statement was later made is not sufficient. Id.  Although the advisement itself is formalistic, the waiver need not be formalistic and the waiver need not comply with the procedures set out in Fed. R. Crim. P. 11 for waiver of an accused's rights to trial in open court during a plea proceeding.  Id.

Whether Mr. Chase Alone effectively waived his Miranda rights requires two inquiries:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the

28

nature of the right being abandoned and the consequences of the
decision to abandon it.

United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting Moran v.

Burbine, 475 U.S. 412, 421 (1986)).

"Only if the 'totality of circumstances surrounding the interrogation'

reveals both an uncoerced choice and the requisite level of comprehension may

a court properly conclude that the Miranda rights have been waived."  Jones,

23 F.3d at 1313.  Examination of the totality of circumstances includes, but is

not limited to, such considerations as the "background, experience, and

conduct" of the defendant.  Jones, 23 F.3d at 1313 (quoting United States v.

Barahona, 990 F.2d 412, 418 (8th Cir. 1993)).

### 1.     Whether Mr. Chase Alone's Miranda Waiver was Voluntary

The same analysis concerning the voluntariness of a defendant's

confession under the Fifth Amendment applies to determine whether a

defendant's Miranda waiver was voluntary.  See Makes Room for Them, 49

F.3d at 415 (a court must consider the conduct of the police when determining

whether defendant's will was overborne with regard to either his confession or

his Miranda waiver).  Under either analysis, "[a]bsent evidence that

[defendant's] will [was] overborne and his capacity for self-determination

critically impaired *because of* coercive police conduct," a waiver of Miranda

rights will be considered voluntary.  Spring, 479 U.S. at 574 (emphasis

supplied).  The agents in this case did not coerce or threaten Mr. Chase Alone

in any way to elicit either his statements or <u>Miranda</u> waiver.  Instead, they patiently explained the <u>Miranda</u> rights, took special pains to make sure that Mr. Chase Alone understood those rights, providing an advisement of rights form for Chase Alone's review, going over the form with him, asking if he understood, and having him read a portion of the form to ensure he could read. Accordingly, the court finds that Mr. Chase Alone voluntarily waived his <u>Miranda</u> rights.

### 2.    Whether Mr. Chase Alone's <u>Miranda</u> Waiver was Knowing and Intelligent

With regard to this second inquiry, whether Mr. Chase Alone made a knowing and intelligent waiver, "[a] waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right . . . ." <u>Thai v. Mapes</u>, 412 F.3d at 977.  Although police coercion is a necessary predicate to finding that a waiver was involuntary, it is *not* determinative on the separate issue of whether the waiver was knowing and intelligent.  <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998).

"As a general matter . . .  an accused who is admonished with the warnings prescribed by this Court in <u>Miranda</u> has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one . . . ." <u>United States v. Garlewicz</u>, 493 F.3d 933,

936 (8th Cir. 2007).  "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."  Moran, 475 U.S. at 422-23.

The Court in Miranda explained further:

At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it– the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere . . . .

The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.

Miranda, 384 U.S. at 467-68, 469.

In Turner, police officers stopped Turner's vehicle after observing erratic driving.  Id. at 553.  Officers administered field sobriety tests to Turner and concluded that he was under the influence of some drug other than alcohol. Id. at 554.  After arresting Turner and advising him of his Miranda rights, officers transported him to jail and conducted a urine test, which came back positive for phencyclidine (PCP).  Id.

31

Officers again advised Turner of his Miranda rights and Turner signed a waiver form, initialing each admonition.  Id.  During the interview, Turner appeared cooperative; however, he subsequently exhibited bizarre behavior.  Id.  Upon examination, several psychiatrists diagnosed Turner with a having a PCP-induced psychotic disorder and an intelligence quotient ("IQ"), in the low-average to borderline range.  Id.  Turner moved to suppress the statements he made to law enforcement, arguing that, because of his low IQ, PCP intoxication, and mental illness, he did not have the mental capacity to intelligently and knowingly waive his constitutional rights.  Id.

The court rejected this argument, finding the following facts persuasive: Turner was cooperative during the interview; he reviewed and initialed each admonition of the waiver form; he agreed to answer questions; he gave accurate information; and he appeared intelligent enough to understand his rights.  Id. at 555.  See also North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver..."); Rohrbach, 813 F.2d at 145 (in determining that defendant's waiver was knowing and intelligent, the court found persuasive the fact that his history of arrests, convictions, and reform school made him quite familiar with the criminal justice system).  The Turner court concluded that Turner's waiver of his Miranda rights was knowing and intelligent.  Turner, 157 F.3d at 557.

32

In United States v. Marquez, 605 F.3d 604 (8th Cir. 2010), the Eighth Circuit held that the district court did not err in concluding that defendant voluntarily and intelligently waived his Miranda rights where defendant's first language was Spanish, but where he conversed with investigators easily in English and his girlfriend testified that the defendant spoke "conversational" English and that she could converse with him on most subjects most of the time in English.  Id. at 609.

The advisement of rights given by the agents in this case to Mr. Chase Alone fully and fairly described Mr. Chase Alone's Miranda rights in plain and simple language.  The evidence shows that Mr. Chase Alone was able to read and comprehend the form and the rights they described.  He affirmatively testified that he understood the waiver.  He never testified that he did not understand the rights.  Accordingly, the court concludes that Mr. Chase Alone's wavier was also knowing and intelligent.

**C.     Whether Mr. Chase Alone Invoked His Right to Remain Silent**

Mr. Chase Alone argues in his brief that, although he initially waived his Miranda rights and agreed to speak to Agents Rice and Blackburn, he later invoked his right to remain silent by attempting to leave.  "A suspect invokes his right to remain silent by making 'a clear, consistent expression of a desire to remain silent.' "  United States v. DeMarce, 564 F.3d 989, 994 (8th Cir. 2009) (quoting United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989)).  "Indirect, ambiguous, and equivocal statements or assertions of an intent to

33

exercise the right to remain silent are not enough to invoke that right for the purposes of <u>Miranda</u>." <u>United States v. Ferrer-Montoya</u>, 483 F.3d 565, 569 (8th Cir. 2007) (citing <u>United States v. Johnson</u>, 56 F.3d 947, 955 (8th Cir. 1995)). " 'Being evasive and reluctant to talk is different from invoking one's right to remain silent.' " <u>DeMarce</u>, 564 F.3d at 994 (quoting <u>Ferrer-Montoya</u>, 483 F.3d at 569 (quoting <u>Mann v. Thalacker</u>, 246 F.3d 1092, 1100 (8th Cir. 2001))). The issue of whether a suspect invoked his right to remain silent is a factual question, reviewed for clear error. <u>Ferrer-Montoya</u>, 483 F.3d at 569.

Here, even by Mr. Chase Alone's own account of the events, he changed his mind about whether to end the interview without any coercion or efforts on the part of the agents. Accordingly, Mr. Chase Alone's attempt to assert his right to remain silent was not a "consistent expression of a desire to remain silent." <u>DeMarce</u>, 564 F.3d at 994. The court concludes that Mr. Chase Alone's statement was not taken in violation of his right to remain silent.

**D.      Whether Mr. Chase Alone's Sixth Amendment Right Was Violated**

At the time Agent Rice and Blackburn interrogated him, Mr. Chase Alone had been charged with a tribal offense arising out of the same facts as the federal charges in this case, he had made a court appearance on the tribal charges, and he was represented by Ken Bordeaux on the tribal charges. Mr. Chase Alone argues that the agents' interrogation of him without the presence of Mr. Bordeaux violated his Sixth Amendment right to counsel.

"To establish a Sixth Amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant." United States v. Singer, 785 F.2d 228, 234 (8th Cir. 1986). The burden of proving a Sixth Amendment violation rests with the defendant. See Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986) (inferring that it is the defendant's burden); Moore v. United States, 178 F.3d 994, 999 (8th Cir.), cert. denied, 528 U.S. 943 (1999) (reciting that it was the defendant's burden of proving a Sixth Amendment violation).

The Sixth Amendment right to counsel is offense specific. McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). Thus, a defendant who has counsel representing him on armed robbery charges which occurred in West Allis, Wisconsin, can permissibly be questioned by police without the presence of his lawyer on allegations of murder and armed robbery which occurred elsewhere. Id. at 175-82.

In addition, under double jeopardy analysis, the federal government and the tribal government are two separate sovereigns. Heath v. Alabama, 474 U.S. 82, 88 (1985) (double jeopardy analysis). Thus, the double jeopardy clause is not violated when two separate sovereigns prosecute the same defendant for the same crime. Id. at 88-94. Here, the federal government and the tribal government are two separate sovereigns. United States v. Red Bird, 287 F.3d 709, 713, 713 n.5 (8th Cir. 2002).

35

When faced with the fact pattern presented in this case, the Eighth Circuit has declined to fully rely on double jeopardy analysis in determining whether a defendant's right to counsel under the Sixth Amendment was violated when federal officials interrogate a defendant after the initiation of tribal proceedings.  Red Bird, 287 F.3d at 714-15.  Instead, there are several factors the Eighth Circuit evaluates in determining if a defendant's Sixth Amendment rights have been violated under such circumstances.  First, the Eighth Circuit looks to whether the tribal and federal cases charge the same offense by determining whether each offense requires proof of a fact which the other does not.  Red Bird, 287 F.3d at 715 (citing Texas v. Cobb, 532 U.S. 162, 173 (2001) (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932))).  Then the court looks to whether the defendant had a right to counsel in tribal proceedings, whether the defendant asserted his right to counsel in tribal proceedings, whether the tribal proceedings were adversarial in nature, and whether the federal interrogator was aware of the pending tribal charges.  Red Bird, 287 F.3d at 714-15.  See also United States v. Doherty, 126 F.3d 769, 772 (6th Cir. 1997) (no Sixth Amendment violation occurs where tribal proceeding was nonadversarial).

In Red Bird, the court held that the defendant's Sixth Amendment rights were violated where he had previously been arraigned in an adversarial proceeding in tribal court and asserted his right to counsel.  Red Bird, 287 F.3d at 714-15.  Under the Rosebud Sioux Tribal Constitution, criminal

36

defendants are accorded a right to be represented by a licensed attorney, and a licensed attorney is provided for indigent defendants if they cannot afford to hire an attorney with their own resources.  Id. at 713.  Key to the court's holding that Red Bird's Sixth Amendment rights were violated was the fact that the federal investigators were fully aware of the pending tribal charges and that the federal agents and tribal agents were working together in tandem to investigate and prosecute the defendant.  Id. at 713-15.

In United States v. Plumman, 409 F.3d 919 (8th Cir. 2005), the court held no Sixth Amendment violation occurred.  Id. at 926.  Relying on Red Bird, Plumman argued that federal officials violated his right to counsel where tribal charges against him had been initiated on the same day that FBI agents interviewed him.  Id.  The Eighth Circuit rejected the claim because the record indicted that the FBI agents were not aware of the tribal charges and it was unclear whether the tribal charges were asserted before or after the FBI interview took place.  Id.  The defendant was in temporary custody in the tribal Children's Court, but that proceeding was civil in nature and, thus, no Sixth Amendment right applied to those charges.  Id.

In United States v. Dupris, 422 F. Supp. 2d 1061 (D.S.D. 2006), the defendant had been arraigned in tribal court for the Cheyenne River Sioux Tribe on tribal charges of rape, aggravated assault, assaulting a law enforcement officer, aggravated trespass and public nuisance.  Id. at 1065.  He was represented by the tribal public defender's office, a lay advocate who had

only a GED and no college or legal training.  Id.  Significantly, under tribal law, the defendant had no right to court-appointed counsel.  Id.  Rather, if defendant wanted legal representation, he was required to retain the attorney of his choice at his own expense.  Id.  Subsequent to defendant's appearance in tribal court, he was interrogated by an FBI agent and a polygraph was administered.  Id.  The FBI agent did not know that tribal charges were pending against the defendant nor that defendant had appeared at a tribal hearing with representation.  Id.  Under these facts, the court held that no Sixth Amendment violation occurred.  Id. at 1063-64.

Here, Mr. Chase Alone's counsel introduced no evidence as to the elements of the tribal charges he was facing as compared to the elements of the crimes he is facing in this court, whether he had a right to court-appointed counsel under tribal law, or whether his representative in tribal court, Mr. Bordeaux, qualifies as "counsel" within the meaning of the Sixth Amendment.  A lay advocate does not constitute "counsel" within the meaning of the Sixth Amendment.  United States v. Perez, No. CR 08-50033-KES, 2009 WL 363618, at *2 (D.S.D. Feb. 12, 2009); United States v. Cottier, No. CR 08-50050-AWB, 2009 WL 473236, at *3 (D.S.D. Feb. 24, 2009); United States v. Tools, No. CR 07-30109-KES, 2008 WL 2595249, at *6 (D.S.D. June 27, 2008); United States v. Killeaney, No. CR 07-300630-01-KES, 2007 WL 4459348, at *5 (D.S.D. 2007); United States v. Dupris, 422 F. Supp. 2d 1061, 1068 (D.S.D.

2006); <u>United States v. Whitefeather</u>, No. CR 053881DWFRLE, 2006 WL 763204, at *2 (D. Minn. Mar. 24, 2006).

Mr. Chase Alone argues in his supplemental brief that the enactment of the Tribal Law and Order Act of 2010, Pub. L. 111-211, Title II; 124 Stat. 2258 alters the analysis of the above-cited cases holding that lay advocates are not "counsel" for purposes of Sixth Amendment analysis.  Mr. Chase Alone argues specifically that it is implicit in the Tribal Law and Order Act that Congress was honoring the legitimacy of duly constituted tribal courts.  <u>See</u> Docket No. 31, at 10.  And that the Act provides for greater coordination between federal and tribal officials concerning prosecution of crimes in Indian Country.  Both of those assertions are true regarding the Act.  However, Mr. Chase Alone points to no direct language in the Act that would mandate a different Sixth Amendment analysis, nor does Mr. Chase Alone cite any case law so holding.

The district court cases cited above rely on Sixth Amendment analysis, not the analysis of statutory provisions, in determining whether a defendant's right to counsel has been violated.  As the <u>Killeaney</u> court noted, the Supreme Court, interpreting the Sixth Amendment, has drawn a "clear distinction between licensed legal counsel and lay representation under the Sixth Amendment."  <u>Killeaney</u>, 2007 WL 4459348, *5 (citing <u>Wheat v. United States</u>, 486 U.S. 153, 159 (1988) (stating that "[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects . . .. [r]egardless of his persuasive powers, an advocate who is not a member of the

39

bar may not represent clients . . . in court.")).  Neither the Supreme Court, nor any appellate court to address the issue, have held that the Sixth Amendment right to counsel encompasses the right to representation by a person who is not a licensed attorney admitted to practice before the bar of the court. Killeaney, 2007 WL 4459348, *5 (citing Wheat, 486 U.S. at 159; Pilla v. American Bar Ass'n., 542 F.2d 56, 58-59 (8th Cir. 1976); United States v. Anderson, 577 F.2d 258, 261 (5th Cir. 1978); United States v. Scott, 521 F.2d 1188, 1191-92 (9th Cir. 1975); United States v. Grismore, 546 F.2d 844, 847 (10th Cir. 1976); United States v. Jordan, 508 F.2d 750, 753 (7th Cir. 1975)).

Furthermore, the Red Bird court pointed out the fact that the Bill of Rights and the Fourteenth Amendment to the United States Constitution are inapplicable to Indian tribes.  Red Bird, 287 F.3d at 713 (citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978)).  Since tribes are separate sovereigns whose existence pre-dates the adoption of the United States Constitution, they are not constrained by the constitutional provisions that restrict federal or state authority.  Id.  And although the Indian Civil Rights Act, 25 U.S.C. §1302(6), guarantees the right to counsel in tribal criminal prosecutions, that guaranty is only at the expense of the defendant.  Id.

The burden of proving a Sixth Amendment violation rests with Mr. Chase Alone.  Kuhlmann, 477 U.S. 459; Moore, 178 F.3d at 999.  Mr. Chase Alone has provided no evidence that Ken Bordeaux was a licensed attorney nor that the Oglala Sioux Tribal Constitution accorded Mr. Chase Alone with a right to

40

licensed counsel.  In fact, the Oglala Sioux Tribal Constitution, unlike the
Rosebud Sioux Tribal Constitution analyzed in <u>Red Bird</u>, specifically provides
that if a criminal defendant wishes to be represented by counsel, the defendant
must obtain and pay for that representation at the defendant's own expense.
<u>See</u> Oglala Sioux Tribal Constitution, Art. XII(f)
([www.oglalalakotanation.org/OLN/OST_Constitution.html](http://www.oglalalakotanation.org/OLN/OST_Constitution.html)).  Mr. Chase Alone's
failure to introduce evidence to prove the relevant <u>Red Bird</u> factors results in
the conclusion that Mr. Chase Alone's assertion that his Sixth Amendment
rights were violated as a basis for suppressing his statement should be denied.

## CONCLUSION

This court respectfully recommends that Mr. Chase Alone's motion to
suppress [Docket No. 17] be denied in all respects.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and
recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B),
unless an extension of time for good cause is obtained.  <u>See</u> Fed. R. Crim. P.
59(b); 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the
waiver of the right to appeal questions of fact.  <u>Id.</u>  Objections must be timely
and specific in order to require *de novo* review by the district court.  <u>See</u>

41

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665

(8th Cir. 1986).

      Dated May 9, 2011.

              BY THE COURT:

              /s/ *Veronica L. Duffy*

              VERONICA L. DUFFY
              UNITED STATES MAGISTRATE JUDGE